# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| ) |  |
| ) |  |
| **PAUL J. JONES,** ) |  |
| ) |  |
| **Plaintiff,** ) |  |
| ) |  |
| **v.** ) | **Civil Action No. 16-11011-DJC** |
| ) |  |
| **NANCY A. BERRYHILL,** ) |  |
| **Acting Commissioner of Social Security,** ) |  |
| ) |  |
| **Defendant.** ) |  |
| ) |  |
| ) |  |

_____

## MEMORANDUM AND ORDER

**CASPER, J.**                                                             **August 29, 2017**

## I.      Introduction

Plaintiff Paul J. Jones ("Jones") filed applications for disability insurance benefits ("SSDI") and supplemental security income ("SSI") with the Social Security Administration ("SSA") on August 21, 2012.  R. 201, 208.[1]  Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), Jones brings this action for judicial review of the final decision of Defendant Nancy A. Berryhill,[2] Acting Commissioner of the SSA ("the Commissioner"), issued by an Administrative Law Judge ("ALJ") denying Jones's applications for SSDI and SSI benefits on December 5, 2014.  R. 16.  Jones filed two separate motions to reverse and remand the ALJ's decision denying SSDI and SSI benefits.  D. 26; D. 28.  Thereafter,

---

[1] "R." refers to citations to the Administrative Record, filed at D. 11.

[2] Nancy A. Berryhill is now Acting Commissioner of the SSA.  Pursuant to Fed. R. Civ. P. 25(d), the Court has substituted Nancy A. Berryhill for the previous Acting Commissioner, Carolyn W. Colvin, as Defendant in this suit.

the Commissioner moved to affirm the ALJ's decision.  D. 30.  For the reasons discussed below, the Court DENIES Jones's motions to reverse and remand, D. 26; D. 28, and GRANTS the Commissioner's motion to affirm, D. 30.

## II.     Factual Background

Jones has previously worked as a dietary aide, stock clerk, truck driver and in construction.  R. 83, 97, 230, 235.  Jones alleged that as of December 31, 2010, he was unable to work due to bilateral shoulder pain and arthritis in his right knee.  R. 77, 201, 208.

## III.     Procedural History

On August 21, 2012, Jones filed *pro se* applications for SSDI and SSI benefits, asserting that he had been disabled since December 31, 2010.  R. 201, 208.  After an initial review, the SSA denied his claims on December 26, 2012.  R. 114.  Jones obtained counsel on February 24, 2013, R. 120, and requested reconsideration of his claims on February 26, 2013, R. 121, but the SSA again found Jones ineligible for benefits, R. 123.  On August 21, 2013, Jones requested a hearing before an ALJ.  R. 129.  The hearing was originally scheduled for June 18, 2014, R. 138, but at Jones's counsel's request, it was rescheduled for November 4, 2014, R. 168-69.  At the hearing before the ALJ, Jones and Ralph Richardson, a vocational expert ("VE"), testified.  R. 19, 51-66.  Jones's counsel also submitted a letter from Boston Medical Center ("BMC"), dated April 11, 2013, and a letter from the University of Massachusetts Disability Evaluation Services, dated January 2, 2014, to the ALJ at this hearing.  R. 50-51.

In a decision dated December 5, 2014, the ALJ determined that Jones was not disabled and denied his claims.  R. 16.  Jones requested review of the ALJ's decision on February 5, 2015.  R. 7-8.  The Appeals Council granted Jones a twenty-five day extension to submit additional evidence on February 20, 2015.  R. 9.  Jones's counsel claims that he submitted additional records from

BMC to the Appeals Council on March 18, 2015, April 24, 2015, December 14, 2015 and January 20, 2016.[3]  D. 29 at 1.  After reviewing the administrative record and additional evidence submitted by Jones, the Appeals Council denied Jones's request for review on March 30, 2016, thereby making the ALJ's decision the final decision of the Commissioner.  R. 1.

## IV.    Discussion

### A.    Legal Standards

#### 1.    Entitlement to SSDI and SSI

A claimant must qualify as having a "disability" to be entitled to SSDI and SSI benefits. 42 U.S.C. § 416(i)(1).  A "disability" is defined by the Social Security Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  Id. §§ 416(i)(1), 423(d)(1)(A); 20 C.F.R. § 404.1505(a).  To qualify as a disabling impairment, the physical or mental impairment must be sufficiently severe, such that it renders the claimant unable to engage in any previous work or other "substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a).

The Commissioner follows a five-step sequential analysis to determine whether a claimant is disabled and thus whether the application for Social Security benefits should be approved.  20 C.F.R. § 416.920(a); see Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).  The determination may be concluded at any step of the analysis.  20 C.F.R. § 416.920(a)(4).  First, if the claimant is engaged in substantial gainful work activity, the application is denied.  Id. § 416.920(a)(4)(i).

---

[3] The Commissioner contends that there is no indication that the Appeals Counsel received any records on January 20, 2016.  D. 31 at 12.

Second, if the claimant does not have, or has not had, within the relevant time period, a severe medically determinable impairment or combination of impairments, the application is denied.  Id. § 416.920(a)(4)(ii).  Third, if the impairment meets the conditions of one of the listed impairments in the Social Security regulations, the application is approved.  Id. § 416.920(a)(4)(iii).  Fourth, where the impairment does not meet the conditions of one of the listed impairments, the Commissioner determines the claimant's residual functional capacity ("RFC").  Id. § 416.920(a)(4)(iv).  If the claimant's RFC is such that he can still perform his past relevant work, the application is denied.  Id.  Fifth, if the claimant, given his RFC, education, work experience and age, is unable to do any other work within the national economy, he is disabled and the application is approved.  Id. § 416.920(a)(4)(v).

### 2. *Standard of Review*

This Court may affirm, modify or reverse a decision of the Commissioner.  See 42 U.S.C. § 405(g).  Such judicial review, however, "is limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (citing Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (per curiam)).  The ALJ's findings of fact are conclusive and must be upheld by the reviewing court when supported by substantial evidence "even if the record arguably could justify a different conclusion."  Whitzell v. Astrue, 792 F. Supp. 2d 143, 148 (D. Mass. 2011) (quoting Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987)) (internal quotation mark omitted).  Substantial evidence is "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 401 (1971), and exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion," Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

The Court need not conclude that the ALJ's decision was based upon substantial evidence when reached through "ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen, 172 F.3d at 35. If the ALJ made a legal or factual error, this Court may reverse or remand such decision with instructions to consider new material evidence or apply the correct legal standard. See 42 U.S.C. § 405(g); Nguyen, 172 F.3d at 36; Manso-Pizarro, 76 F.3d at 19.

**B.      Before the ALJ**

*1.      Medical History Presented to the ALJ*

When considering Jones's application, the ALJ examined extensive evidence regarding Jones's medical history, including treatment records, assessments and diagnoses. R. 68-485.

a.      Shoulder and Back Pain

Jones's medical records reveal that he had been suffering from shoulder pain since 1995 when he fell off a ramp and onto his back, shoulder and head while at work. See, e.g., R. 308.

In July 2010, Steven Abreu, M.D., recorded Jones's complaints regarding upper back pain after he lifted heavy weights while at work. R. 319-21. Jones experienced no numbness, weakness or paresthesia and had "5/5 strength" in his right upper extremity, but he had pain in his right trapezius. Id. Dr. Abreu then prescribed Ibuprofen and ice for Jones's back pain and recommended that he avoid heavy lifting. Id.

In February 2012, Jones reported to Dr. Abreu that he had pain in his left shoulder from wrestling. R. 349. Dr. Abreu noted that Jones was not in acute distress, had "pain [in his] posterior shoulder with abduction" and had "5/5 deltoid strength." R. 350. Dr. Abreu diagnosed Jones with a rotator cuff strain in his left shoulder and recommended that he take Advil and apply heat to the area. Id. In March 2012, Jones denied having back and joint pain during an office visit with Dr. Abreu. R. 322.

In June 2012, Dr. Abreu recorded that Jones had been suffering from bilateral shoulder pain when he reached backwards for the past month. R. 340. Dr. Abreu noted that Jones was not in acute distress and had normal mobility of his bilateral shoulders, no deformities and 5/5 deltoid strength. R. 341. Dr. Abreu recommended that Jones go to the gym and increase his upper body exercises. Id.

In August 2012, Jones informed Jennifer Smith, R.N., that he had been having discomfort and pain in his right shoulder for the past year. R. 342-43. Jones reported that it started when he tried lifting a heavy truck's door and that he was having difficulty lifting his right shoulder. Id. Smith diagnosed Jones with "tendonitis/bursitis and [a] probable rotator cuff tear." R. 346. Jennifer Uyeda, M.D., reviewed an MRI of Jones's right shoulder on August 11, 2012, which revealed "[s]evere enlargement and nodular contour of the supraspinatus tendon which may represent evolving hydroxyapatite disposition (calcific tendinosis)" and "severe focal tendinosis and degeneration." R. 304. Dr. Uyeda also noted that there was a "[l]ow grade interstitial tear of the infraspinatus tendon with extension into the myotendinous junction" and "[t]endinosis of the long head of the biceps tendon." Id.

In a letter dated August 20, 2012, Joel Caslowitz, M.D., wrote that Jones had "severe bilateral shoulder pain, and a recent MRI showed considerable damage, likely requiring surgery." R. 299. He further stated that Jones was "unable to lift anything because of this [medical condition] and is, therefore, unable to work." Id.

On August 24, 2012, Robert Nicoletta, M.D., an orthopedic surgeon at BMC, evaluated Jones's bilateral shoulder pain—which was greater in his right shoulder than his left—and his one-year history of anterior, superior and lateral pain in both shoulders. R. 302. A MRI of Jones's right shoulder showed evidence of "subacromial bursitis, impingement, and acromioclavicular

arthrosis, without evidence of full thickness rotator cuff tear." Id. Radiographs and the MRI demonstrated evidence of "tendinosis supraspinatus without full thickness tear" and "[i]ncreasing subacromial swelling and bursitis." Id. A physical examination of Jones's right and left shoulders demonstrated "pain on palpation at the acromioclavicular joint" and pain in his right shoulder's anterolateral acromion and anterior subacromial space. Id. Dr. Nicoletta also noted that Jones experienced pain "off the anterolateral acromion" and "[n]o weakness with rotator cuff testing" in his left shoulder. Id. Jones continued to have active and passive range of motion in both shoulders. Id. Dr. Nicoletta diagnosed Jones with chronic bilateral shoulder acromioclavicular arthrosis and impingement tendinitis, noted that Jones had no treatment to date and recommended physical therapy. Id.

Jones began physical therapy for bilateral shoulder impingement on September 11, 2012 at BMC's Physical Therapy Department. R. 308. Jones was admitted to physical therapy twice a week for eight weeks, but did not attend two of his therapy appointments. R. 310-11.

In December 2012, John Manuelian, M.D., a medical consultant for Disability Determination Services, reviewed Jones's medical records. R. 68-87. He determined that Jones had bilateral shoulder pain that was "consistent with chronic bilateral A-C arthrosis with impingement tendinitis." R. 72. He noted that surgical intervention was possible, but Jones had been advised to have physical therapy. Id. Dr. Manuelian concluded that Jones had only limited ability to push, pull and reach with his upper extremities, but had unlimited ability for "gross manipulation," "fine manipulation" and "feeling." R. 72-73. Dr. Manuelian also reported that Jones's medical condition limited him to work at the light exertion level. R. 75.

In February and April 2013, Jones told Raphael Kieval, M.D., a rheumatologist at BMC, that he was suffering from severe pain in his shoulders, chronic back pain and pain in other areas.

R. 355, 371. A physical examination revealed "impingement of the right shoulder" which limited Jones's range of motion in his shoulder, but Jones maintained full range of motion without feeling pain in his hips, knees, ankles and feet. R. 371. Dr. Kieval diagnosed Jones with tendinitis and bursitis in Jones's right shoulder as well as calcific tendonitis based on an MRI. R. 371-72. Dr. Kieval provided an injection to the shoulder and a prescription for Meloxicam, aspirin and physical therapy. R. 355, 372, 378.

Jones also met with Dr. Caslowitz several times in February, March and April 2013 to address the severe pain in his shoulders, which prevented him from working and was not alleviated by Percocet. R. 301, 359-61, 374-75, 379. Dr. Caslowitz noted that Jones had limited motion in his right shoulder but was not under acute distress, and he prescribed Oxycodone. R. 360-61, 374-75, 379-80. A physical examination with Dr. Caslowitz also revealed that Jones was morbidly obese, his motor skills were intact and his posture and gait were normal. R. 374-75, 379.

In July 2013, Subbiah Doraiswami, M.D., a medical consultant to Disability Determination Services, found results similar to those of Dr. Manuelian. See R. 88-99. Specifically, Dr. Doraiswami concluded that Jones's muscle, ligament and fascia disorders were severe, but that Jones's sprains and strains were not severe. Id. at 93. Regarding Jones's "manipulative limitations," Dr. Doraiswami noted that "there should be improvement to a degree [such] that aggressive and repetitive movements may be implemented occasionally" if Jones undertook physical therapy and "surgery if needed." R. 96. He concluded that Jones had light work capability and cited that Jones could perform work as a clocker, election clerk and work ticket distributor. R. 98.

An x-ray of Jones's shoulder taken in August 2013 demonstrated "[b]ilateral almost symmetrical severe tendinosis of [the] supraspinatus tendons with nodular enlargement and foci

of interstitial tear," "[b]ilateral interstitial tear of the infraspinatus tendons" and "[b]ilateral severe tendinosis of the long head of the biceps." R. 470-71. Further medical examinations with Dr. Kieval in September 2013 and an MRI of Jones's shoulders showed that his right shoulder's status was unchanged. R. 432. In Jones's left shoulder, there was "[m]oderate hypertrophic change of the AC joints" and a "trace amount of subacromial bursitis bilaterally." Id. Dr. Kieval noted that Jones may seek surgical correction of the rotator cuff tears if he chose to do so. Id.

On October 2, 2013, Jones visited Dr. Caslowitz complaining of pain in his right shoulder, back and anterior chest, but was not in acute distress. R. 423-24. On October 22, 2013, Dr. Caslowitz noted that Jones had a torn muscle in his shoulder and diffuse osteoarthritis and might need shoulder surgery. R. 420. Jones's medical records show that he was prescribed intermittent narcotics for joint pain and Oxycodone. E.g., R. 417, 423.

An MRI report of Jones's spinal canal and lumbar spine in January 2014 showed multi-level degenerative disk disease, facet arthropathy and some epidural lipomatosis at L4 to S1 level. R. 412, 479-80. Specifically, "[a]t the L4-5 level [the MRI] demonstrate[d] a moderate broad-based disk bulge with mild to moderate narrowing of bilateral neural foramina . . . bilateral moderate facet hypertrophy and mild ligamentous flavum hypertrophy." R. 480. At the L5-S1 level, the MRI showed that Jones had "moderate broad based disk bulge with moderate narrowing of the bilateral neural foramina," moderate facet hypertrophy and a mild to moderately narrowed thecal sac by epidural lipomatosis. Id.

b.      Knee Pain

As early as January 2012, Dr. Abreu noted that Jones complained of knee pain. R. 312. In June 2012, Jones went to the emergency department at BMC complaining of knee pain after bumping his knees two weeks earlier. R. 307. After an examination of his right knee, Jones was

diagnosed with a knee sprain, R. 305, and discharged with prescriptions for Tylenol 3 and Motrin, R. 307.

In September 2012, Jones also met with Peter Everett, M.D., to address his chronic bilateral knee pain. R. 317. In December 2012, Dr. Manuelian determined that Jones's knee sprain was "not severe" and would still allow him to occasionally climb ramps, stairs, ropes, ladders and scaffolds, as well as balance, stoop, kneel, crouch and crawl. R. 72-73. In February 2013, Dr. Kieval diagnosed Jones with osteoarthritis of the acromiclavicular joint and the right knee, but noted that he had full range motion of his knees. R. 371-72. In July 2013, Dr. Doraiswami noted that Jones's bilateral knee pain was from a "sprain and not severe" and that he had "fairly mild" osteoarthritis in his knee. R. 92, 95. In September 2013, Dr. Kieval recorded that Jones had "some osteoarthritis on his x-rays in the left knee." R. 432.

c.      Diabetes Mellitus and Related Health Issues

Medical records from Georgia Montouris, M.D., a neurologist at BMC, confirm that Jones had as history of insulin dependent diabetes mellitus dating back to 1997 or 1999. R. 362. Dr. Abreu's July 2010 report states that Jones had a previous weight in May 2009 of 284 pounds and height of 71.7 inches, and Dr. Abreu recommended he follow a better diet. R. 319-20. In January 2012, Dr. Abreu reported that Jones suffered from neuropathy in his feet and that he had not taken insulin in the past month. R. 312-13. After a physical examination, Dr. Abreu noted that Jones was not in acute distress and had "decreased sensation to [a] pin in his hands and feet." R. 313. Dr. Abreu diagnosed Jones with poorly controlled diabetes, recorded his glucose level to be 404 and prescribed him the appropriate medications. R. 312-16.

Jones saw Dr. Abreu again in March 2012, during which Dr. Abreu noted Jones was not "checking sugars" and was feeling pain in his feet at night. R. 322. One month later, Jones

reported to Dr. Abreu that he felt tingling in his feet and had not been testing his sugars, exercising or watching his diet. R. 325. Dr. Abreu noted that Jones was not in acute distress, discussed with Jones the risk of complications from diabetes and increased his insulin to fifty units per night. R. 326. In June 2012, Dr. Abreu again noted that Jones's diabetes mellitus was poorly controlled and that he had erratic medication use and was not checking his glucose level at home. R at 340-41.

In August 2012, Jones reported to Dr. Caslowitz that he felt a constant, burning pain in his feet and was diagnosed with diabetic peripheral neuropathy. R. 328. In December 2012, Dr. Manuelian assessed that Jones had severe diabetes mellitus and was "massively obese." R. 72, 80.

Records from Dr. Kieval in January 2014 show that he urged Jones to exercise, lose weight and attend a nutrition clinic, but Jones had failed to do so. R. 412. In February 2014, Dr. Deborah Lee, Jones's optometrist, confirmed that Jones also had moderate diabetic retinopathy in his right eye and mild diabetic retinopathy in his left eye. R. 395.

### d. Other Health Issues

In August 2013, Yelena Gorfinkel Pyatkevich, M.D., a sleep specialist at BMC, diagnosed Jones with "moderate obstructive sleep apnea." R. 442-45. In September 2013, Melissa DiPetrillo, M.D., noted that Jones "probably ha[d] obstructive sleep apnea." R. 438. Several other reports indicate that Jones had difficulty sleeping. E.g., R. 401, 438. In September 2013, Jones stated that he was "sleeping better" with CPAP therapy and behavioral observations revealed that Jones had a "good" response to this therapy during a PAP titration study. R. 434-36.

In May 2013, Dr. Montouris reported that Jones had a history of seizures until he was twelve years old. R. 362-65. Jones told Dr. Montouris that he had seizures at night, saw ghosts and demons and complained of nocturia. R. 362-63. Dr. Montouris concluded that he had

"nocturnal events" and there was a question of whether he had parasomnia.  R. 364.  She also noted her doubt that Jones was experiencing seizure activity.  Id.

Jones underwent a psychiatric consultative examination with Michael Kahn, M.D., in June 2013.  R. 386-88.  Jones reported that he believed he had special powers, had been the Apostle Paul in another life and could see into the past and future.  R. 387.  Several reports show that Jones claimed he communicated with saints and God.  E.g., R. 423, 425.  Dr. Kahn determined that although he had schizotypal traits, Jones "may not meet [the] criteria for schizotypal personality disorder" because his idiosyncratic beliefs did not affect his ability to work or have relationships.  R. 387.  Dr. Kahn assigned him an Axis V Global Assessment of Functioning ("GAF") score of 60.[4]  R. 388.

In July 2013, Dr. Ayanna Quinones, Ph.D., a psychological consultant to Disability Determination Services, reviewed Jones's records.  R. 91-93.  Dr. Quinones determined that Jones's personality disorder was not severe and did not restrict Jones's daily activities and social functioning.  Id.  Dr. Quinones assigned Jones an Axis II:  schizotypal or possible schizotypal personality.  R. 93.  Dr. Doraiswami also concluded that Jones's personality disorders were not severe in July 2013.  Id.

2.    *ALJ Hearing*

At the November 4, 2014 hearing, the ALJ heard testimony from Jones and the VE, Ralph Richardson.  R. 48.

---

[4] The GAF scale "is used to report a clinician's judgment of the individual's overall level of psychological, social, and occupational functioning and . . . refers to the level of functioning at the time of evaluation."  Vazquez v. Astrue, No. 10-cv-30136, 2011 WL 1564337, at *1 n.1 (D. Mass. Apr. 25, 2011).  A GAF score of 51 to 60 indicates moderate symptoms or moderate difficulty in social or occupational functioning.  Id.

a.     Jones's Testimony

Jones testified that he previously worked as a part-time dietary aid at BMC, full-time stock clerk at Gillette and truck driver for Rekill Express and then for Olympic Delivery.  R. 52-53.

Jones stated that in 1996, he fell while on a ramp when he was working for Boston Specialty.  R. 53.  Jones testified that his back, shoulders and head "snapped to the ground."  R. 54.  He did not work for a few weeks after the incident, and his back bothered him ever since.  Id. Jones then attempted to work for a few companies, including Olympic Delivery, and tried his own "little thing," but the last time Jones was able to work was the first week of January 2013 because of pain in his shoulder and other areas.  R. 54, 55, 59, 61.

According to Jones, Dr. Caslowitz ordered Jones an MRI "and that's when he determined [Jones] had arthritis . . . [and] tears in [his] shoulders."  R. 54.  Jones's knees and lower back continued to bother him and he was no longer able to bowl, dance, kneel, crawl or crouch as he had done before.  R. 54-55, 58.  Jones stated he was told he had arthritis in and fat around his spine, which would require surgery.  R. 55.  Jones claimed he was "trying to do physical therapy" instead, but the pain in his shoulders was so severe that he "screamed in church one Sunday."  Id.

At the time of his testimony, Jones stated that he was experiencing severe pain, neuropathy in his feet, numbness in his knees and pain in his hips and lower back when he walked.  R. 56-57. He also stated that he needed to lean on railings when walking down stairs and could only walk three or four blocks without sitting down.  R. 56.  Jones testified that he was able to drive an automobile, but turning the steering wheel caused him pain in his shoulders and his feet became numb.  R. 57, 59.  Jones could sit for about thirty to thirty-five minutes before having to stand up because of the pain in his shoulders, back and knees.  R. 57.  Generally, Jones had to lift weight that equaled a gallon of milk with two hands and was unable to raise his arms above his shoulders

due to his pain.  R. 58.  Jones further testified that cold weather worsened his conditions and that he had difficulty sleeping and breathing at night.  R. 58-59, 65.

According to Jones, he visited the BMC in April 2013 for his increased back pain and was told that he had been disabled since 2012.  R. 59-60.  He subsequently visited the University of Massachusetts to have his disability evaluated.  R. 60.  At the date of the hearing, Jones had an MRI for his right shoulder scheduled for several days later.  R. 61.

b.    VE's Testimony

In the VE's opinion, Jones did not acquire any skills that could be transferred to jobs currently existing in the "light, sedentary exertional level."  R. 62-63.  The ALJ then posed two hypotheticals to the VE.  R. 63-64.  First, the ALJ asked the VE to consider an individual:

> who's the same age, education, work history as [Jones] who is able to perform the full range [of] light work, however they possess only occasional ability to climb, balance, stoop, kneel, crouch, or crawl.  They never climb a ladder.  They possess occasional ability to push, pull with both lower extremities.  Occasional ability to reach overhead, in front and laterally with both upper extremities.  They must [avoid] concentrated exposure to wetness and must avoid moderate exposure to cold, vibration, hazard fumes, dusts, gas, and poor ventilation.  This individual [could] perform the claimant's past work.

R. 63.  The VE responded that this individual could not perform the Jones's past work, but that there were hand packer, marker and assembler positions that such a person could perform.  R. 63-64.

Second, the ALJ posed to the VE the same hypothetical with the individual also being off task twenty percent of the time during an eight-hour work day due to pain.  Id.  The VE responded that in this hypothetical scenario, such individual would not be able to perform Jones's past work and there would be no available work for the individual in the economy.  Id.

### 3.      Findings of the ALJ

The ALJ followed the five-step analysis.  <u>See</u> 20 C.F.R. § 404.1520.  At step one, the ALJ found that Jones had not engaged in substantial gainful activity since December 31, 2010, the alleged disability onset date.  R. 22.

At step two, the ALJ concluded that Jones's following impairments were severe:  lumbar degenerative disk disease, bilateral rotator cuff tendonitis and bursitis, osteoarthritis in his knees, diabetes mellitus and obesity.  <u>Id.</u>  With regard to Jones's hypertension, neck pain, hip pain and difficulty breathing, the ALJ stated that the record supports the conclusion that these impairments were not severe.  <u>Id.</u>  The ALJ also stated that the pain in his wrists and fingers of which Jones had testified was a non-medically determinable impairment.  R. 23.

Before proceeding to step three, the ALJ concluded that Jones's personality disorder did not cause more than minimal limitation in his ability to perform basic mental work activities and was therefore not severe.  R. 24.  Regarding the "paragraph B" criteria for evaluating mental disorders, the ALJ found that Jones's medically determinable impairment caused only "mild" limitations in one of the functional areas and no limitations in the remaining three functional areas. <u>Id.</u> (citing 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1)).

At step three, the ALJ determined that Jones did not have an impairment or combination of impairments that met or medically equaled a listing in 20 C.F.R. § 404, Subpart P, Appendix 1. <u>Id.</u>

At step four, the ALJ found that Jones had the RFC to:

perform light work . . . except:  he can only occasionally climb, balance, stoop, kneel, crouch, and crawl; he cannot climb a ladder:  [sic] he can only occasionally push and pull with his bilateral lower extremities; he can only occasionally reach overhead, in front, and laterally, with his upper extremities; he must avoid concentrated exposure to wetness; and he must avoid even moderate exposure to cold, vibrations, hazards, fumes, odors, dusts, gases and poor ventilation.

R. 25. Based on this RFC assessment and the VE's testimony, the ALJ concluded that Jones was unable to perform his past relevant work. R. 39.

At step five, however, the ALJ found that Jones could perform the jobs of hand packer, marker and assembler, all of which existed in significant numbers in the national economy. R. 40. Accordingly, the ALJ found that Jones was not disabled as defined by the Social Security Act. R. 41.

### C.    Jones's Challenges to the ALJ's Findings

Jones seeks reversal of the ALJ's decision, D. 26, or, in the alternative, for the Court to remand the case to the SSA for a new administrative hearing, D. 28. Jones argues that (1) the ALJ failed to develop the record adequately, D. 29 at 4; (2) the ALJ committed error in refusing to consider the evidence that Jones submitted on the day of the administrative hearing, id.; (3) the ALJ's findings were not supported by substantial evidence, D. 27 at 3; D. 29 at 3-4; and (4) the Appeals Council failed to consider all the evidence in the record, D. 29 at 3.[5]

#### 1.    The ALJ Did Not Err in Developing the Record

After the hearing before the ALJ, Jones's counsel submitted "[v]oluminous medical records" from BMC to the Appeals Council that were not reviewed by the ALJ previously. D. 29 at 1. Jones contends that because of the existence of these records, the ALJ did not satisfy his burden to produce a "complete" record pursuant to 42 U.S.C. § 423(d)(5)(B). D. 29 at 4.

---

[5] Jones also contends that the ALJ erred by not obtaining a medical expert's opinion as required by Social Security Ruling (SSR) 83-20: Onset of Disability, 45 Fed. Reg. 55,566 (Aug. 20, 1980). D. 26 ¶ 9. Jones, however, provides no argument as to why this was erroneous. "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Accordingly, the Court will not address this issue.

The Social Security Act and its legislative history provides that the claimant bears "the burden of showing a medically determinable impairment." Bowen v. Yuckert, 482 U.S. 137, 138 (1987).[6]  Specifically, the claimant has a duty to exercise reasonable diligence in providing the Secretary with relevant evidence to satisfy his burden of production at the first four steps of the process. Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).  The ALJ is allowed to rely on the claimant's counsel to present the claimant's case such that his claims can be adequately explored.  See Dwyer v. Astrue, No. 11-cv-12048-JGD, 2013 WL 3965398, at *10 (D. Mass. July 31, 2013).  Here, it was Jones's, not the ALJ's, obligation to provide information and fill in any gaps that may have existed in the record.

The Commissioner, however, still has an "obligation to develop an adequate record from which a reasonable conclusion can be drawn." Carrillo Marin v. Sec'y of Health & Human Servs., 758 F.2d 14, 17 (1st Cir. 1985).  The Social Security Act requires the Commissioner to "develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability."  42 U.S.C. § 423(d)(5)(B). There are limited scenarios in which the ALJ has greater responsibility to develop the record:  (1) the plaintiff is unrepresented by counsel; (2) the claim is substantial on its face; (3) there are gaps in the evidence necessary to make a reasoned evaluation of the claim; and (4) the ALJ can fill in these gaps without undue effort.  Heggarty v. Sullivan, 947 F.2d 990, 997 (1st Cir. 1991).  Failure to fill in evidentiary gaps in the administrative record may require remand to the Commissioner for further development of the record.  See King v. Colvin, 128 F. Supp. 3d 421, 437-38 (D. Mass.

---

[6] The claimant bears this burden in steps one through four because "[i]t is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so."  Cruz v. Astrue, No. 06-cv-30087-KPN, 2007 WL 1442354, at *6 (D. Mass. May 2, 2007) (quoting Bowen, 482 U.S. at 146 n.5) (internal quotation marks omitted).

2015) (explaining that adequate grounds for remand existed because "the record before the ALJ strongly suggested that there were significant gaps in the evidence"); <u>Mickevich v. Barnhart</u>, 453 F. Supp. 2d 279, 287 (D. Mass. 2006).

Here, however, Jones fails to show why the ALJ was obligated to develop the record further. First, Jones was represented by counsel since February 24, 2013, several months prior to his hearing before the ALJ. R. 120. Second, for the reasons detailed below, this is not a case in which the claims are substantial on their face.

Lastly, Jones does not argue that there were any gaps in the record requiring the Commissioner to request more information nor that the ALJ could provide "without undue effort" additional evidence to fill in any gaps. <u>See</u> D. 27 at 3; <u>see also</u> <u>Heggarty</u>, 947 F.2d at 997. Jones merely asserts that "the record before the ALJ was far from complete," only because additional medical records related to Jones's injuries existed at the time of the hearing. D. 29 at 4. But "[t]he mere existence of evidence in addition to that submitted before the hearing examiner will not constitute sufficient cause for remand." <u>Evangelista v. Sec'y of Health & Human Servs.</u>, 826 F.2d 136, 139 (1st Cir. 1987); <u>Amador v. Barnhart</u>, No. 05-cv-11648-DPW, 2006 WL 1650977, at *3 (D. Mass. June 14, 2006) (explaining that the ALJ "need not 'go to inordinate lengths to develop a claimant's case'" when the ALJ possesses complete medical history (quoting <u>Thompson v. Califano</u>, 556 F.2d 616, 618 (1st Cir. 1977)). <u>Brooks v. Colvin</u>, 217 F. Supp. 3d 455, 463-64 (D. Mass. 2016) (concluding that remand was appropriate because new evidence revealed critical information regarding the plaintiff's previously unknown surgical complications and diagnosis), is inapposite. Unlike the plaintiff in <u>Brooks</u>, who pointed to specific instances where the record was incomplete and could have been filled in as to the particular disability in question, <u>id.</u> at 458, Jones does not explain how the record before the ALJ was deficient as to his particular disabilities,

nor does he demonstrate how the additional records supplied to the Appeals Council and the letters from BMC and the University of Massachusetts Disability Evaluation Services were necessary to develop the record before the ALJ.  R. 50-51, 66; see Evangelista, 826 F. 2d at 139-41 (holding that remand is appropriate "only where the court determines that further evidence is necessary to develop the facts of the case fully, [and] that such evidence is not cumulative").

Even if the Court concludes that the ALJ erred in developing the record—which it does not—the petitioner must still show that the outcome of the administrative decision would have been different absent those errors.  See Shinseki v. Sanders, 556 U.S. 396, 409 (2009).  Remand is warranted only where the petitioner can demonstrate that the ALJ's failure to request additional information was unfair or that the additional evidence might have led to a different conclusion.  See Evangelista, 826 F.2d at 139 (explaining that consideration of further evidence must be essential to a fair hearing to compel remand); see also Brooks, 217 F. Supp. 3d at 463 (holding that if the ALJ failed to fill in evidentiary gaps and this failure prejudiced plaintiff's claim, remand may be appropriate).

An administrative record that spans many years, deals with an array of ailments and fully develops the facts of the case suggests that the claimant was afforded a fair hearing.  See Evangelista, 826 F.2d at 140.  Here, Jones's medical record before the ALJ, like that found adequate in Evangelista, was "voluminous, detailed, and complex," as it contained hundreds of pages of treatment records, assessments and diagnoses from several sources.  See id.; see also Amador, 2006 WL 1650977, at *4-5 (D. Mass. June 14, 2006) (holding that the ALJ did not err because the administrative record was "replete" with details regarding the claimant's medical conditions).  Indeed, the ALJ referenced physical examinations and imaging as well as opinions from multiple sources, including those of Dr. Manuelian and Dr. Doraiswami, when concluding

that "the record as a whole does not support a finding that [Jones's] impairments are of greater severity than demonstrated by the objective evidence alone." R. 38. The ALJ also noted that Jones's ability "to do light housework, grocery shop and drive, [along] with his failure to pursue pain alleviating modalities such as physical therapy" led him to conclude that Jones's testimony was "not credible" and his pain would not "significantly interfere with his ability to lift, sit, stand or walk." Id.

Thus, Jones does not explain how the additional evidence would have necessitated a different determination. See Bard v. Astrue, No. 12-cv-22-NT, 2012 WL 5258197, at *2 (D. Me. Sept. 28, 2012) (requiring the plaintiff to show that any failure to carry out the duty to develop the record was unfair or prejudicial). Jones provides to this Court neither the additional evidence that he contends the ALJ was required to obtain nor descriptions of what those medical records contain. See Lovern v. Astrue, No. 09-cv-40098-TSH, 2011 WL 4621455, at *6 (D. Mass. Sept. 29, 2011). The Court, therefore, cannot conclude that the ALJ failed to develop the record or that this failure was prejudicial or unfair to Jones.

### 2. The ALJ Did Not Err in Refusing to Admit Jones's Late Evidence

Jones argues that the ALJ's refusal to consider the two letters submitted on the day of the hearing before the ALJ constituted reversible error. D. 27 at 3.

Any written evidence that a claimant wants the ALJ to consider must be submitted no later than five business days before the date of the hearing. 20 C.F.R. § 405.331(a). If a claimant submits evidence fewer than five days before the hearing, the ALJ may consider such evidence if: (1) the ALJ's actions misled the claimant; (2) the claimant has a "physical, mental, educational, or linguistic limitation" that prevented earlier submission; or (3) "[s]ome other unusual, unexpected, or unavoidable circumstance beyond [claimant's] control" prevented earlier submission. Id. §

405.331(b).  If one of the exceptions is not triggered, the ALJ may decline to admit this evidence. Id. § 405.331(a); see also Cardoso v. Colvin, No. 13-cv-12296-FDS, 2014 WL 3735242, at *11 (D. Mass. July 25, 2014).

There is no dispute that in the instant case, Jones belatedly submitted the letters from BMC and the University of Massachusetts Disability Evaluation Services to the ALJ.  R. 51; D. 31 at 9. Jones, however, does not demonstrate that his late-filed records fall into one of the three exceptions under Section 405.331(b).  See D. 29 at 2.  First, there is no suggestion that the ALJ's actions misled him in any way.  D. 29 at 2-3.  Jones's counsel admitted below that he and Jones were in charge of requesting the records and that only when Jones himself "finally went to Boston Medical Center" were they able to obtain them.  R. 51.  Second, there is no indication that Jones had a "physical, mental, educational, or linguistic limitation" that prevented earlier submission.  See R. 50-51; see also 20 C.F.R. § 405.331(b)(2).  Jones's counsel merely explains that he "had no way of knowing that each receipt [of records] was not a complete copy of the records requested."  D. 29 at 2.  Furthermore, the fact that Jones had been obtaining and submitting records prior to the date of the ALJ hearing shows that any possible "physical, mental, educational, or linguistic limitation[s]" had been overcome previously and should not have prevented Jones from submitting the two letters to the administrative record in a timely fashion.  See R. 50-51; see also 20 C.F.R. § 405.331(b)(2).

Third, Jones makes no showing that the two-to-three month delay between his requests for the medical letters and his receipt of them, R. 50-51, was a result of an "unusual, unexpected, or unavoidable circumstance beyond [his] control."  See 20 C.F.R. § 405.331(b)(3); see also Freeman v. Colvin, No. 14-cv-412-JHR, 2015 WL 4041733, at *3 (D. Me. July 1, 2015) (holding that even though the claimant requested and re-requested records, had "some difficulty" getting the records

in a timely manner and received records only one day prior to the hearing, this showing still fell short of the requirements under Section 405.331(b)(3)). A claimant must explain and corroborate with evidence "when he became aware of the missing records, why he only then became aware of them, how soon afterward he requested them, and what efforts he thereafter made to secure them in a timely fashion. Such details are material to assessment of whether the standard is met." Id. Jones's counsel merely contends that he "sought to obtain all relevant medical records" from the BMC and gives no detailed explanation as to why BMC did not provide the records in a timely fashion despite his attempts to obtain them. D. 29 at 4. These bare assertions fall short of the "rather rigorous standard" of Section 405.331(b)(3). See Raymond v. Astrue, No. 12-cv-92-DBH, 2012 WL 6913437, at *2 (D. Me. Dec. 31, 2012).

Rather, the Court accepts the ALJ's rationale for refusing to admit the belatedly offered evidence. Here, the ALJ explained that Jones had "plenty of time to obtain and submit the evidence in question." R. 19. The ALJ further explained that Jones received his first Notice of Hearing on March 20, 2014 for his June 18, 2014 hearing, but at no point during this period did Jones submit evidence to the ALJ. R. 19. Indeed, Jones also requested a change of hearing date on June 12, 2014 and received a revised Notice of Hearing on August 15, 2014, giving him an extension of time to obtain and submit additional records. R. 168-169. The ALJ also noted that the two letters were submitted on November 4, 2014, even though they were dated April 11, 2013 and January 2, 2014. R. 19, 50-51, 138, 144. Thus, Jones was fully aware of an upcoming hearing date and the existence of missing records—he told the ALJ that "[w]e've been requesting [the records] for two months, three months to get them"—yet he still failed to retrieve them before his November 2014 hearing. D. 29 at 2; R. 51. Because Jones has not established that an exception to Section 405.331(a) applies, the ALJ did not err by refusing to admit the two letters into evidence.

*3.      Substantial Evidence in the Medical Record Supported the ALJ's Decision*

Beyond repeating arguments about the ALJ's refusal to consider supplemental letters and records, Jones does not provide sufficient support for his argument that there was no substantial evidence to support the ALJ's conclusions.  <u>See</u> D. 27 at 3.

 This Court finds that the ALJ's findings are supported by substantial evidence. Specifically, there is sufficient medical evidence demonstrating that although Jones suffered from bilateral shoulder pain, back pain and knee pain, these ailments were not severe enough to interfere with his ability to sustain light work activities in accordance with the RFC set forth by the ALJ. For his back and shoulder pain, the record shows that Jones was only treated with ice and Ibuprofen until January 2012.  R. 35.  It was not until August 2012 that Dr. Caslowitz wrote in a letter that Jones's shoulder pain was so severe that he could no longer work.  R. 299.  Dr. Nicoletta and Dr. Kieval recommended physical therapy for his shoulder, R. 302, 372, and his treating physicians noted that Jones was not in acute distress, <u>e.g.</u>, R. 341, 350, 400.  Jones was diagnosed with multilevel degenerative disk disease in January 2014, but a physical examination performed by Dr. Dipetrillo in February 2014 showed that Jones had normal posture, gait and mobility.  R. 400, 480.

Regarding his knee pain, Jones first complained of knee pain in January 2012, R. 312, and was diagnosed with a knee sprain after bumping his knee in June 2012, R. 305-06.  He was discharged with prescriptions for Tylenol and Motrin.  <u>Id.</u>  In December 2012, Dr. Manuelian made the assessment that Jones's sprains and strains would still allow him to occasionally climb ramps, stairs, ropes, ladders and scaffolds, as well as balance, stoop, kneel, crouch and crawl.  R. 68-85. Additionally, Dr. Kieval noted that Jones had full-range motion of his knees in February 2013 and Dr. Doraiswami recorded that Jones's sprain was not severe in July 2013.  R. 93, 371-72.

Furthermore, there is nothing in the record indicating the ALJ "ignore[d] medical evidence or substitute[d] his own views for uncontroverted medical opinion." Cf. Nguyen, 172 F.3d at 35 (holding that the ALJ erred because relevant MRI results and doctors' opinions were never mentioned in the decision). Here, the ALJ noted that Dr. Caslowitz's opinion in August 2012, which concluded that Jones would not be able to work because of his severe bilateral shoulder pain, was not supported by the state agency consultants' assessments that Jones's pain was not sufficiently severe enough to render him disabled. R. 38. The ALJ also explained that Dr. Caslowitz's opinion was rendered two years from the date of the decision and that this opinion was also "inconsistent with later evidence, as documented by Dr. Kahn in June 2013, that the claimant was doing light housework and going shopping, indicating at least some ability to lift and carry." R. 39. Additionally, the ALJ explained that Dr. Caslowitz's opinions were inconsistent with the later opinions of Dr. Manuelian and Dr. Doraiswami, who stated that Jones retained the ability to perform light work with some limitations. Id. The VE also stated in his testimony that an individual with the claimant's age, education, work experience and RFC could perform occupations such as hand packer, marker and assembler. R. 40. The ALJ was within his discretion to give greater weight to the opinions of the State Agency medical consultants, Dr. Manuelian and Dr. Doraiswami, because he found "these opinions to be consistent with the record as a whole, and with the claimant's reported activities, including his ability to engage in light housework, to grocery shop and to drive." R. 38; see Cox v. Astrue, No. 08-cv-10400-DPW, 2009 WL 189958, at *10 (D. Mass. Jan. 16, 2009) (holding that because the record as a whole provided substantial evidence, the ALJ's decision regarding the plaintiff's subjective complaints of pain was appropriate).

Thus, because the ALJ's determinations are supported by substantial evidence, the Court concludes that he did not commit reversible error.

4.     *The Court will not review the Appeals Council's refusal to review the ALJ's Decision*

Jones contends that the Appeals Council erred by not referencing the medical records submitted with dates after December 2014 from the BMC before declining his request for review. D. 29 at 3. "[A]n Appeals Council decision refusing review has all the hallmarks of a discretionary decision." Mills v. Apfel, 244 F.3d 1, 5 (1st Cir. 2001); see also Haskell v. Colvin, No. 13-cv-482-JL, 2015 WL 419663, at *4 (D.N.H. Feb. 2, 2015). This Court may review the Appeals Council's decision "'to the extent that it rests on an explicit mistake of law or other egregious error,' i.e., 'an articulated but severely mistaken view.'" Haskell, 2015 WL 419663, at *4 (quoting Mills, 244 F.3d at 5).

Here, as is customary, Appeals Council gave no specific reason for denying Jones's appeal. See id. (explaining that it is "customary practice" for the Appeals Council not to give reasons for denying a claimant's request to review the ALJ's decision). The Appeals Council stated that the additional records from the BMC provided by Jones "do[] not show a reasonable probability that, either alone or when considered with the other evidence of record, [they] would change the outcome of the decision." R. 2. Contrary to Jones's assertions, the Appeals Council did note that the additional evidence Jones submitted from BMC to the Appeals Council was reviewed, including records from November 4, 2014 through February 4, 2015. R. 2. The Appeals Council stated that it also reviewed the evidence from BMC dated March 10, 2015, March 18, 2015 through April 16, 2015, and March 18, 2015 through November 6, 2015, and determined that because the

ALJ's decision was dated December 5, 2014, the evidence "does not affect the decision about . . . [Jones's disability] beginning on or before December 5, 2014."[7]  R. 2.

Even if records dated after December 2014 were improperly excluded from the Appeals Counsel's consideration, "the Appeals Council need only consider the new evidence if there is 'reasonable probability that the evidence, alone or when considered with the other evidence of the record, would change the outcome of the decision.'" Cardoso, 2014 WL 3735242, at *12 (quoting 20 C.F.R. § 405.401(c)); Moore v. Astrue, No. 11-cv-11936-DJC, 2013 WL 812486 at *12 (D. Mass. Mar. 2, 2013).  Here, Jones merely contends that the medical records submitted to Appeals Council with dates after December 2014 "address[] the injuries claimed," but he makes no showing as to how the records dated after December 2014 would have affected his disability benefits determination before December 2014.  D. at 29 at 3.  This case thus stands apart from those in which the Appeals Council made egregious error because it denied review of records dated after the ALJ's decision that were explicitly retrospective and relevant to the plaintiff's disability before the ALJ's decision.  See, e.g., Chigas v. Colvin, No. 15-cv-457-LM, 2016 WL 3166419, at *4 (D.N.H. June 6, 2016); Brennan v. Barnhart, No. 05-123-P-H, 2006 WL 217987, at *2 (D. Me. Jan. 25, 2006).  These bare assertions fall short of showing that any error, let alone an egregious

---

[7] Jones claims that a sentence six remand under 42 U.S.C. § 405(g) is appropriate based on new and material evidence that was not previously submitted with good cause.  See D. 29 at 3.  The Supreme Court has explained that such remand is "appropriate when the district court learns of evidence not in existence or available to the claimant at the time of the administrative proceeding that might have changed the outcome of that proceeding."  Miller v. Astrue, No. 2009-cv-12018-RBC, 2011 WL 2462473, at *15 (D. Mass. June 16, 2011) (quoting Sullivan v. Finkelstein, 496 U.S. 617, 626 (1990)).  "The phrase 'at any time of the administrative proceeding' includes action at the Appeals Council level."  Id. (quoting Sullivan, 496 U.S. at 626).  Because Jones admits that he submitted new evidence to the Appeals Council and the Appeals Council explicitly stated that it had been reviewed, this new evidence does not serve as the basis for a sentence six remand.  See id.

error, was committed such that this Court is required to review the Appeals Council's decision. See Mills, 244 F.3d at 5.

## V.     Conclusion

For the foregoing reasons, the Court DENIES Jones's motions to reverse and remand, D. 26; D. 28, and GRANTS the Commissioner's motion to affirm, D. 30.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge